Argued and submitted May 26; judgment of conviction for criminal mischief in the second-degree reversed and remanded, remanded for resentencing, otherwise affirmed October 7, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JESSICA JANE SMITH,
aka Jessica Jane Brewer, aka Jessica Smith,
*Defendant-Appellant.*

Coos County Circuit Court
18CR27943; A169164

476 P3d 521

Defendant was convicted of second-degree criminal mischief, ORS 164.354, and second-degree criminal trespass, ORS 164.245, after allegedly entering the victim's property and smashing the front of his motor coach with a baseball bat. She assigns error to the trial court's admission of three of the victim's statements, which he allegedly made to the investigating officer, as prior consistent statements under OEC 801(4)(a)(B). *Held*: The trial court erred by admitting the victim's prior statements. The state did not offer the prior consistent statements to rebut an inconsistent statement and defendant did not open the door by charging the victim, either expressly or impliedly, with recent fabrication or improper motive. Vigorous cross-examination alone is not sufficient to admit prior consistent statements over a hearsay objection. The Court of Appeals concluded that the error was not harmless as to the criminal mischief in the second-degree conviction but that it was harmless as to the trespass conviction.

Judgment of conviction for criminal mischief in the second-degree reversed and remanded; remanded for resentencing; otherwise affirmed.

Martin E. Stone, Judge.

Matthew Blythe, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Judgment of conviction for criminal mischief in the second-degree reversed and remanded; remanded for resentencing; otherwise affirmed.

**MOONEY, J.**

A jury convicted defendant of second-degree criminal mischief, ORS 164.354, and second-degree criminal trespass, ORS 164.245. She appeals from the judgment of conviction, assigning error to two of the trial court's evidentiary rulings. We write to address the first assignment of error only.[1] Defendant contends that the trial court erred in admitting three statements made by the victim, C, to the investigating officer as "prior consistent statements" under OEC 801(4)(a)(B). That is so, she argues, because (1) the state did not offer the prior consistent statements to rebut an inconsistent statement and (2) defendant did not charge C, either expressly or impliedly, with recent fabrication or improper motive. She argues, therefore, that the statements were hearsay and should have been excluded as such. The state argues that the prior statements were admissible under OEC 801(4)(a)(B) to rebut an "imputation of inaccurate memory." Defendant responds that the state did not preserve that theory of admissibility and, even if it did, OEC 801(4)(a)(B) does not allow admission of prior consistent statements to rebut an imputation of inaccurate memory. We agree that it was error for the trial court to admit the three prior statements under OEC 801(4)(a)(B). That error was not harmless as to the criminal mischief conviction. We therefore reverse and remand the judgment of conviction for criminal mischief in the second degree.

## STANDARD OF REVIEW

We review the trial court's ultimate legal conclusion as to whether an out-of-court statement is admissible as nonhearsay under OEC 801(4) for legal error. *State v. Hartley*, 289 Or App 25, 29, 407 P3d 902 (2017). We begin with the relevant and largely undisputed factual and procedural circumstances, taken from the record, and summarized as follows.

---

[1] In her second assignment of error, defendant asserts the "best evidence" rule and contends that the trial court erred in allowing the investigating officer to testify about the contents of a cell phone video that the victim had played for him. The original video was not in evidence. Defendant did not preserve that assignment of error, and we reject it for that reason.

## FACTUAL AND PROCEDURAL BACKGROUND

C lives on a 20-acre parcel of land along the Coquille River in rural Coos County. Dotted along his property are various "no trespassing" signs posted to dissuade people from wandering from the river onto C's property during the summer months. One sign reads "no trespassing," another reads "keep out," one indicates that C has cameras monitoring his property, and others contain more colorful messages conveying the same general information. C also has fencing and gates on his property, clearly demarcating the boundaries. Sitting within his fencing was a "1955 GMC motor coach Classic" bus, which C had refurbished to rent to campers.

C testified that, one day in August 2017, he heard "screaming and hollering, cussing and stuff," coming from the direction of the river. He investigated the noise, and when C saw defendant and a man "beating on some metal" object on or near his property, he told them to leave his property. According to C, at that point, defendant began "screaming" at him and "beating" on his bus with a "stick." C again told them to leave, but defendant threw her stick toward C, grabbed a baseball bat, and "went down to the bus and continued to beat the windshield, the door, and the mirror." C told them to leave his property "at least three times," and he "wasn't polite about it."

C recorded much of the encounter on his cell phone. He called 9-1-1 after it appeared to him that defendant and her companion were not leaving. Two officers responded to the 9-1-1 call—Patrol Sergeant Slater of the Coos County Sheriff's Office and Officer Davis of the Powers Police Department. Slater testified that, when he arrived, he observed various "no trespassing" signs on the property, as well as the bus, which had its window "completely smashed." C showed Slater the video that he had taken. Slater testified that, on the video, he observed defendant and a man enter and walk onto the property, near the bus, and then observed defendant screaming and pointing at C, and her companion was "yelling and pointing his finger" at C while holding a baseball bat. Slater also testified that, when he watched the video, he was standing on C's property at the same location where the video was taken. Davis testified that he

recognized the man in the video from a previous encounter and went to the man's house, where he located and arrested defendant, who, he testified, appeared to be "[a]gitated and slightly under the influence, intoxicated." For her role in the incident, defendant was charged with second-degree criminal mischief and second-degree criminal trespass.

At trial, after recounting the facts of his encounter with defendant, C explained that the incident had him "feeling physically threatened" and "scared." On direct examination, when asked whether he had a clear recollection of the incident, C testified:

"It's been pretty well burnt in my mind when somebody threatens my life which has happened in the past. And I don't usually forget that. *** I lost a lot of nights sleep, even had to go see my doctor about issues with thinking about things."

On cross-examination by defense counsel, when asked about his ability to accurately recall how he felt and what he told Slater at the time of the incident, C provided this testimony:

"[Question]:   So you were scared?

"[C]:   Well, when somebody comes at you with a baseball bat if you're not scared then there's something wrong with you.

"[Question]:   So you didn't tell *** Officer Slater that they didn't scare you?

"[C]:   At that point I don't really know what I said. I was pretty pumped up and [in] defense mode.

"[Question]:   So you don't really remember clearly?

"[C]:   What I said? I said, 'These people did this.'

"[Question]:   You don't remember how you felt?

"[C]:   I was pumped up. Have you ever been—

"[Question]:   Were you scared?

"[C]:    I was scared, yes.

"[Question]:   So you wouldn't have said that they didn't scare you?

"[C]:   I don't really remember saying that."

When defense counsel offered to refresh C's recollection with the police report, C responded that it was difficult for him to read due to having "had a stroke, couple strokes," and he asked if counsel would read it to him. Counsel declined and continued his cross-examination of C. C did not read from Slater's report and the report was not read to him.

As C's cross-examination continued, a number of relevance objections were raised and argued regarding inquiry into C's medical and mental health conditions. Defendant argued that such questions were relevant "to describe state of mind and the conditions at the time." When the court asked, "so his ability to perceive?" defense counsel responded, "yes." The court allowed questions generally pertaining to C's ability to perceive and remember events. It excluded testimony related to C's "mental health issues" as unduly prejudicial given the lack of connection to C's "ability to observe and perceive or remember on" the day of the incident. Up to that point, the discussion and arguments focused on relevance and C's capacity to observe, perceive, and recall.

The state then raised the separate question concerning prior consistent statements, arguing that, because C "had been exposed to vigorous cross-examination," Slater should be allowed to testify to statements that C had made to him on the day in question that were consistent with his trial testimony about the events that occurred. It argued that the statements were admissible as prior consistent statements under OEC 801(4)(a)(B) because of the "vigor" of the cross-examination. Defense counsel argued that his cross-examination of C had been "cut off" by objections and not "all that vigorous." Given the state of the record at that point, he argued that the prior consistent statement rule did not apply. The court later permitted the prior statements to come in through Slater, reasoning that, because defense counsel had been holding the police report in his hand as he cross-examined C, poised to begin reading those out-of-court statements, he was "challenging whether or not [C's] story that he is telling right now was the same story that he told the police officer." The court reached that conclusion even though defense counsel did not actually read from

or otherwise use the report in his cross-examination of C. Slater later testified that C made these three statements to him: (1) that a woman had been on his property; (2) she had broken the windows of his bus with a baseball bat; and (3) he told her to leave his property more than once.

Defendant was convicted of both charges and this appeal followed.

## ANALYSIS

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. OEC 801(1), (3). Hearsay is generally not admissible. OEC 802. The evidence code excludes certain types of out-of-court statements from the definition of hearsay. The "prior consistent statement" rule, set forth in OEC 801(4)(a)(B), excludes the following statements from the definition of hearsay:

> "(4)   A statement is not hearsay if:

> "(a)   The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

> "*****

> "(B)   Consistent with the testimony of the witness and is offered to rebut an inconsistent statement or an express or implied charge against the witness of recent fabrication or improper influence or motive[.]"

In the everyday parlance of trial lawyers and judges, the proponent of prior consistent statements essentially argues that the objecting party "opened the door" for such evidence by eliciting testimony that discredits the consistent in-court testimony. The prior consistent statement is offered not for its truthfulness, but rather to increase the trustworthiness of the in-court statement.

A party opens the door to the admission of prior consistent statements in one of two ways. The first and most common way is by suggesting, through cross-examination, that the witness has some underlying motive to lie. *See, e.g.*, *State v. Bautista*, 271 Or App 247, 253, 351 P3d 79 (2015) (asserting that a witness had a motive to lie because of "dysfunctional family dynamics" and to obtain a favorable result

on her U-Visa application). The other way to open the door to the admission of such statements is to insinuate that the witness fabricated his story by raising, through cross-examination, questions regarding the witness's actual memory of events. *State v. Johnson*, 340 Or 319, 343, 131 P3d 173 (2006) (out-of-court statement was admissible under OEC 801(4)(a)(B) to rehabilitate a witness whose truthfulness and accuracy of memory had been challenged in cross-examination); *Cook v. Safeway Stores, Inc.*, 266 Or 77, 88, 511 P2d 375 (1973); (same). The door does not open, however, to permit the admission of prior consistent statements simply because a party raises general questions about the credibility or perceptiveness of the witness through "vigorous cross-examination." *See Powers v. Officer Cheeley*, 307 Or 585, 594-95, 771 P2d 622 (1989) (if contradictions in testimony alone amounted to charges of fabrication, the argument would apply in many cases and, in effect, repeal the rule of OEC 801(4)(a)(B), rewarding "the garrulous but not the reticent"); Christopher B. Mueller & Laird C. Kirkpatrick, 4 *Federal Evidence* § 8:38 (4th ed 2019) ("Perhaps the most fundamental common law limit is one holding that *not every kind* of impeaching attack paves the way for repair by consistent statements." (Emphasis in original.)).

Here, the declarant, C, testified at trial and he was subject to cross-examination. The state did not identify a prior inconsistent statement by C that would have permitted it to introduce the prior consistent statements to rehabilitate C's in-court testimony, and we do not understand the state to now argue that an inconsistent statement existed. Nor does the state claim that defendant made an express or implied "charge" against [C] of "recent fabrication or improper influence or motive." Instead, the state contends that C's earlier statements were admissible to rebut defendant's challenge to the accuracy of C's memory.

The state argues that C's prior consistent statements were admissible because defendant impliedly charged C—through cross-examination of C—with "fabrication" due to faulty memory occasioned by health problems. Defendant did attempt to raise questions about C's ability to accurately *perceive* the incident, and there was also some question about C's ability to clearly remember and relate

what he perceived, at least with respect to whether he was "scared." And, while the state did not specifically make a faulty memory argument at trial, there was at least some discussion before the court that defendant was questioning C's ability to accurately perceive and recall the incident. The trial court's conclusion that defendant had "been challenging whether or not [C's] story that he is telling right now was the same story that he told the police officer" is certainly broad enough to include both. But defense counsel ended his cross-examination before actually challenging the consistency of the statements at issue. Defendant's attempt to raise questions about C's medical history was shut down when the court sustained objections to those questions. Defense counsel acknowledged that he was *about* to attempt to impeach C with statements that he made to Slater by reading the statements from the police report, but he did not do so.

Defense counsel did not imply that C fabricated the statements at issue—due to his faulty memory, or otherwise. At most, he began to challenge C's credibility by questioning his capacity to fully perceive and recall the events of that day due to his "mental health" issues. But, asking questions that are generally probative of a witness's ability to perceive or recall or that generally call into question a witness's credibility do not alone open the door to the admission of that witness's prior consistent statements. Moreover, a line of questions that is aborted before it reaches the point of charging the witness with lying does not open the door to the use of that witness's prior consistent statements. *See* Mueller & Kirkpatrick, 4 *Federal Evidence* § 8:38 ("[T]he exception comes into play only *after* an impeaching attack[.]" (Emphasis added.)). Permitting the preemptive use of prior consistent statements would undermine the purpose of the OEC 801(4)(a)(B) that permits such statements when the statutory requirements are met.

The only statement defendant directly challenged as being false was C's statement that he was "scared," but the state did not attempt to admit a prior consistent statement about that. Although C reiterated, unprompted, on cross-examination that he told Slater that "these people did this," defense counsel ignored that answer and instead

continued to focus on questioning C about whether he was "scared." The statements that were admitted were not logically connected to a charge of recent fabrication or improper motive. Because C's prior consistent statements at issue were not admissible under the state's theory, the court erred by admitting them.

Having determined that the trial court erred by admitting C's prior statements to Slater, we must determine whether the error was harmful. A defendant who seeks reversal based on a claim of evidentiary error bears the burden to show a likelihood that the admission or exclusion of the challenged evidence affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). "In assessing whether erroneously admitted or excluded evidence affected the verdict, we consider the nature of the evidence in the context of the trial as a whole." *State v. Simon*, 294 Or App 840, 849, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019). "We also consider how the case was tried and the extent to which the disputed evidence was or was not emphasized by the parties and central to their theories of the case." *Id.* However, "[i]n the absence of overwhelming evidence of guilt, we have held that where * * * erroneously admitted hearsay evidence significantly reinforces the declarant's testimony at trial, the admission of those statements" requires reversal. *State v. Wood*, 253 Or App 97, 101, 289 P3d 348 (2012).

Defendant was charged with second-degree criminal mischief for her role in damaging C's bus.[2] C was the only eyewitness to testify at trial. He testified that defendant "was beating on the bus" and that she "went down to the bus and continued to beat the windshield, the door,

---

[2] Under ORS 164.354:

"(1) A person commits the crime of criminal mischief in the second degree if:

"(a) The person violates ORS 164.345, and as a result thereof, damages property in an amount exceeding $500; or

"(b) Having no right to do so nor reasonable ground to believe that the person has such right, the person intentionally damages property of another, or, the person recklessly damages property of another in an amount exceeding $500."

The state charged defendant with second-degree criminal mischief under paragraph (b).

and the mirror" with a baseball bat. Slater testified that C told him that same story immediately after the incident. Slater's testimony thus reinforced C's story because C told it the same way twice. And because C was the only person to see the windshield get smashed, that reinforcement significantly bolstered C's credibility. In the absence of other "overwhelming evidence of guilt," admitting the prior consistent statements into evidence was harmful as to the second-degree criminal mischief conviction.

Defendant was also charged with second-degree trespassing for entering and remaining on C's property without permission.[3] C and Slater both testified about the number of "no trespassing" signs on C's property, as well as the extent of fencing and other property demarcations. C testified that he told defendant to leave his property, that she refused, and that he took a cell phone video of her on his property. The state also admitted an exhibit showing the location and boundaries of C's property and the location of the bus on the property. Slater testified about the contents of C's cell phone video, including the fact that defendant and the man with her were actually on C's property and near the bus when he confronted them. Davis testified that he recognized the man in the video and that, when he went to the man's home, defendant was there with him. Given that evidence, C's statements to Slater likely had little, if any, role in the guilty verdict reached by the jury on the criminal trespass charge. Unlike the criminal mischief charge, C's credibility was not the central issue in proving that defendant unlawfully entered and remained on C's property. Even without the prior consistent statements, there was still overwhelming evidence of defendant's guilt on the trespass charge. At most, those statements were cumulative of the video reviewed in court and all the other evidence, including the no-trespassing signs, fencing, C's property boundaries, and C's own testimony. Therefore, any error in admitting the statements was harmless as to the criminal trespass conviction.

---

[3] Under ORS 164.245(1):

"A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in a motor vehicle or in or upon premises."

Judgment of conviction for criminal mischief in the second-degree reversed and remanded; remanded for resentencing; otherwise affirmed.